**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

_____

**BENDERSON DEVELOPMENT**
**COMPANY, INC.,**

                              **Plaintiff,**                   **98-CV-0241Sr**

**v.**

**NEUMADE PRODUCTS CORPORATION,**

                            **Defendant.**

_____


## DECISION AND ORDER

Pursuant to 28 U.S.C. § 636(c), the parties have consented to the assignment of this case to the undersigned to conduct all proceedings in this case, including the entry of final judgment. Dkt. #8.


Currently before the Court is the plaintiff's renewed motion for summary judgment on the first and second causes of action claiming liability pursuant to the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"); the fourth cause of action claiming breach of contract; and the sixth and eleventh causes of action claiming that Neumade engaged in an ultra-hazardous activity and created a public nuisance. Dkt. #54. For the following reasons, plaintiff's motion for summary judgment on its CERCLA contribution claim is granted, and the remainder of plaintiff's motion for summary judgment is denied.

## BACKGROUND

On August 5, 1959, Benderson Development Company's ("Benderson's"), predecessor, Walden Industrial Park,[1] entered into a Memorandum of Lease with Morrison International Corporation regarding real property located at 2485 Walden Avenue.  Slater Aff., ¶¶ 17, 19; Exh. 5.  The term of the lease ran from February 1, 1960 through January 31, 1982, with a right to renew for two consecutive five-year terms.  Slater Aff., ¶ 18; Exh. 6.  On May 11, 1967, Benderson consented to the assignment of Morrison International Corporation's lease rights to Neumade Products Corporation ("Neumade").  Slater Aff., ¶ 19; Exh. 7.  Neumade manufactures, sells and distributes equipment for the film industry, including storage equipment, overhead projectors, cabinets and lamp houses.  Dkt. #59, ¶ 28.  The lease was extended for two consecutive five-year terms, through January 31, 1991.  Slater Aff., ¶ 20.

On July 13, 1990, staff from the New York State Department of Environmental Conservation ("NYSDEC"), conducted a Resource, Conservation and Recovery Act ("RCRA"), inspection at Neumade.  Exh. 12.  A memorandum detailing that inspection states that

> During the inspection, numerous Class I/High Priority violations were documented.  The company was not complying with any of the hazardous waste requirements – claiming that they were unaware of our rules and regulations.  Staff observed an area on-site near their parking lot where paint wastes were dumped on the ground

---

[1] Walden Industrial Park consists of six buildings configured in a U shape, sharing common driveways and parking areas. Dkt. #59, ¶ 29.  Neumade occupied a building at the bottom of the U, closest to the railroad tracks and farthest from Walden Avenue. Exh. B.

(size of disposal area was 12' x 12').[2]  There was also a paint stain across the parking lot at least 80 feet long where liquids migrated from the disposal area.  Although company representatives did not admit to dumping their waste on the ground, the preponderance of the evidence supports the accusation.

Neumade manufactures metal film and audio storage racks. These racks are spray painted with a solvent base paint.  A solvent thinner (xylene) is also used to clean equipment. MSD sheets indicate that most of these paints are ignitable and some contain lead and/or chromium.

* * *

Because of the seriousness of the violations and the potential for an environmental release, criminal violations should be evaluated.

Exh. 12.  The staff person conducting the inspection noted that

It appears that waste paint and solvent has been accumulated in 4 or 5 drums which were dumped recently. The residue was still soft and there was a solvent odor in the area.

Exh. 12.

On March 10, 1991, Neumade entered into an Order on Consent with the NYSDEC in which it was required to comply with each of the eighteen hazardous waste management regulations it had violated and to comply with the terms of a Spill Clean-Up Plan prepared by Snyder Engineering.

---

[2] In his affidavit in opposition to Benderson's motion for summary judgment, Neumade's plant manager, King Mix, avers that these paint chunks were red and green, colors Neumade did not use in its operations, but which were used by the prior tenant, Morrison International Corporation.  Mix Aff., ¶ 28. Mr. Mix avers that workers hired by Benderson improperly threw old vent hoods contaminated by paint off of the roof while re-roofing the building, and then left them on the ground to rust and deteriorate.  Mix Aff., ¶ 28.

Exh. 15.   The eighteen violations cited by the NYSDEC included the following:

- Storage containers were not in good condition and leakage or spillage had occurred;

- Containers holding hazardous waste were stored in a manner that caused it to leak; and

- Neumade does not operate the facility to minimize the release of hazardous waste constituents to the environment.

Exh. H.  Neumade plead guilty to one misdemeanor count of violating Environmental Conservation Law § 71-2711, endangering public health, safety or the environment, fourth degree, in the Town of Cheektowaga Court and paid a $25,000 fine.  Exh. 16.

On November 26, 1991, Benderson reported a petroleum spill caused by five failing underground storage tanks located around a building adjacent to Walden Avenue.  Exh. B & C.

On December 9, 1991, Benderson and Neumade entered into a new lease, which, *inter alia*, provided as follows:

**HAZARDOUS SUBSTANCES**

54. A. Lessee shall not conduct any activities with respect to the Demised Premises or the shopping center which result in the generation, storage or release of any toxic, hazardous or similar substances (as those terms may be defined from time to time in any federal, state or local law, rule or regulation).  Lessee shall bear all liability for any claim, injury, loss or damage to any person or the environment as a result of any such toxic, hazardous or similar substances and Lessee will save Lessor harmless and indemnify Lessor against any such loss, claim, injury or damage.

* * *

-4-

54. C. Environmental Cleanup.  At the end of the Lease term, including any renewal or extension thereof, Lessee will provide Lessor with any environmental clearance which may be required by any governmental authority having jurisdiction.  Until such time as the Demised Premises are delivered to the Lessor by the Lessee in a "clean" condition, as specified by law, Lessee will pay to Lessor the monthly rental based upon the then fair market value during said interim period, and will notify Lessor at least ninety (90) days prior to obtaining a clean condition report as specified by law.

* * *

54. E. Lessee further agrees to properly and accurately label and segregate all materials stored at the Demised Premises, as required by law.  At all times during the term hereof, and upon the termination of the terms hereof, Lessee shall comply with all applicable environmental protection laws, rules or requirements and shall promptly cure all violations thereof arising from its non-compliance, including but not limited to the preparation, delivery and/or filing with the applicable governmental authorities and with the Lessor, of all forms, certificates, notices, documents, plans and other writings, and the furnishing of such other information as may be required or requested by the Lessor, its mortgagee or any applicable governmental authority in connection with the sale, lease, transfer, mortgaging or other disposition of the building and/or lands. It is specifically acknowledged and agreed that the provisions of this paragraph shall survive the termination of the Lease, regardless of the reason or cause thereof.

Exh. 8.


In a memorandum dated April 15, 1992, NYSDEC Representative Tom Johnson detailed the remedial work being performed in accordance with the cleanup plan prepared by Snyder Engineering.  Exh. T.  With respect to Area #5, "located on the south end of the blacktop loading area," the memorandum recounted that

Visible paint waste is seen solidified on the soil surface in this area.  A pick is used to penetrate the ½" – 1" layer of paint for soil sampling. Immediate solvent odors were given off upon penetration.  HNU readings ranged from 250-300 ppm in the soils.

\* \* \*

Holes were punched into the blacktop near the edge of the drive with no HNU readings registered.  Contamination appears to have migrated downward to an unknown depth.  Excavation of this area appears to be a feasible means of cleanup to remediate the paint disposal.

Exh. T.

As part of proposed revisions to the cleanup plan, Snyder Engineering

noted the following:

Area 5 is located on the Southeast side of the building at the edge of the blacktopped area.  This area is suspected by the NYSDEC of being a paint and waste solvent disposal area.  The dried paint was scraped away and an Hnu meter reading of greater than 20 ppm was obtained from the ambient air.  A hole was dug down to a depth of approximately 12 inches.  Strong solvent odors were noted during this digging.  The Hnu meter indicated the presence of significant concentrations of volatile organics in the material encountered during the digging process . . . . Based upon these preliminary findings, it appears that the solvent concentrations decrease significantly with depth.  Due to the degree of contamination present in this area, a determination was made that additional shallow depth sampling and analysis in this area would serve no purpose until the material which is obviously contaminated (based on Hnu readings) is removed.  The actual lateral and vertical extent of volatile organic contamination must be ascertained as part of the excavation process.

Exh. 17.

On January 20, 1993, Snyder Engineering submitted a "Remediation Action Certification Report for Neumade Products, Inc. in Cheektowaga, New York." Exh. 18.   This report indicated that approximately 70 cubic yards of material "contaminated with paint solvents (xylene, toluene, and ethylbenzene) and paint sludge" were removed from Area  #5.  Exh. 18; Exh. S.  In addition, material "characterized by an odor different than the paint solvents" was also removed.  Exh. 18.  Tom Johnson, the NYSDEC representative onsite during this excavation noted that

> While digging at the northwest corner of the pit a flow of blackish water flowed into the hole from under the blacktop. A petroleum sheen was observed in this area.  Further excavation exposed a black, oily, aromatic material.

Exh. S.  As a result of this discovery additional excavation was undertaken until the "black stained material came to an end."  Exh. S.


On September 14, 1993, upon review of a report dated August 4, 1993 (which does not appear to have been included in the record before the Court), the NYSDEC "determined that the remedial requirements of the Order have been complied with."  Exh. S.


Benderson removed the five underground petroleum storage tanks and 80 tons of contaminated soil on December 4, 1993.  Exh. C.  The NYSDEC closed the site on January 4, 1994 after determining that soil samples in the excavation area were below its soil guidance values.  Exh. C.

By letter dated November 26, 1996, counsel for Benderson advised

counsel for Neumade that

> During our routine pre-vacancy inspection conducted by
> Bruce Marchese of our office and Mr. King Mix of Neumade
> on November 21, 1996, several environmental concerns
> were noted.  These are directly related to the nature of the
> Lessee's use of the Premises.
>
> Prior to the expiration of the Lease, please provide us with
> an inspection of the leased Premises by a mutually
> acceptable environmental firm confirming the leased
> Premises are not in violation of any applicable environmental
> law or regulations.

Exh. 10.

On March 27, 1997, at the request of Benderson, GZA conducted a site

visit to assess potential environmental concerns at the site and observed, *inter alia*, a

"paint shop with several paint booths" and "55 gallon drums of metal fragments" in the

loading dock area, which was marked as a "hazardous waste storage area."  Exh. 26.

GZA recommended collection of soil samples in the areas identified as being of

concern and a sediment sample from the "loading dock sump adjacent to the

hazardous waste storage area."  Exh. 26.

On April 1, 1997, GZA obtained soil samples from the paint shop area,

under the asphalt outside the rear door, and from sediment in the loading dock sump.

Exh. 27.  GZA reported that

> Several volatile organic chemicals and petroleum-based
> chemicals were found.  NYSDEC TAGM[3] levels for acetone

---

[3] Gary Klawinski, GZA's representative at the site, affirms that the NYSDEC's "Division Technical
and Administrative Guidane Memorandum (TAGM 4046): Determination of Soil Cleanup Objectives and

of 2,000 ppb were exceeded in the paint shop area which
had a soil sample concentration of 4,600 ppb, and in sump
sediments in the loading dock area where a concentration of
21,000 ppb was recorded.  Levels for m, p-xylenes 7,400
ppb and o-xylenes 3,100 ppb were detected in the paint
shop area.  Sump sediments in the loading dock area
contained m, p-xylenes 15,000 ppb and o-xylenes of 6,300
ppb.

Exh. 31.

On April 4, 1997, the parties reached a Lease Modification Agreement,

which extended the term of the lease and set rent through June 30, 1997, at which time

Neumade agreed to "promptly vacate and surrender the Demised Premises . . . time

being of the essence."  Exh. 9.

On June 17, 1997, Benderson sent Neumade a letter noting Neumade's

failure to respond to its letter of November 26, 1996, referencing the Hazardous

Substances provisions in the lease, and specifically advising that

As set forth in paragraph 54C of the Lease, Neumade must
provide Benderson Development with an environmental
clearance for the premises and must continue to pay rent for
ninety (90) days after providing us with a clean condition
report on the premises.

It is our concern that there are significant environmental
problems as a result of your use of the premises.  As a
result, we solicited a proposal from GZA, Geo Environmental
of New York for subsurface explorations and a sump
evaluation of the site, a copy of which is attached for your
review.

---

Cleanup Levels" are soil cleanup objectives for inactive hazardous waste sites which "are believed to limit
significant threats to human health and/or the environments posed by an inactive hazardous waste site."
Dkt. #54, Klawinski Aff., ¶¶ 10-11.

The issues surrounding your contamination of the property must be resolved as soon as possible.  Please contact me at your earliest convenience regarding a proposed resolution to this problem.

Exh. 11.  Benderson commenced this action on April 8, 1998.  Dkt. #1.


In a report to counsel for Benderson dated April 6, 1999, GZA concluded

that

Residual contamination (ethylbenzene, xylene and acetone) was detected at several locations on-site.  These areas include the former paint shop area, spill area #5 and B-1 (north of the building).

The concentrations of ethylbenzene and xylenes (compounds commonly associated with petroleum) detected in soil samples (for the samples described in this report) are below the NYSDEC guidance for remediation of petroleum contaminated sites (STARS) with the exception of B-3 (m&p xylene at 181 ug/kg).  The NYSDEC guidance for mixed xylenes is 100 ug/kg.  Location B-3 is associated with Spill Area #5 which reportedly was suspected to be a paint and waste solvent disposal area.  Additional criteria for cleanup of these compounds includes the NYSDEC recommended soil cleanup objective (TAGM 4046), for use at inactive hazardous waste site. [sic] The TAGM 4046 criteria for total xylene is 1,200 ug/kg.  The total detected xylene at B-3 (291 ug/kg) is below the TAGM 4046 criteria.

The concentration of acetone detected in soil samples are below the NYSDEC recommended soil cleanup objective for use at inactive hazardous waste site [sic] (TAGM 4046) for acetone.  It is also noted that acetone is a common laboratory contaminant, and its reported presence is often an artifact of the analytical process.

Based on the sampling and testing for this report, no additional work related to impacted soil is recommended.  However, impact from possible sump water contamination is not known.

Exh. 29.

-10-

Neumade's former plant manager, King Mix, was deposed on August 3, 1999.  Exh. 19.  He admitted Neumade's use of products containing acetone and xylene.  Exh. 19.  In addition, Material Safety Data Sheets, Waste Disposal Notification Sheets and Neumade's List of Hazardous Compounds and Reportable Quantities contained in it's Spill Prevention Control and Countermeasure Plan all indicate that Neumade utilized acetone, ethylbenzene, toluene and xylene in its production process. Exh. 21, 22 & 23.  Mr. Mix explained that the paint sludge in the parking lot area resulted from Feldman Barrel employees tipping over 55-gallon paint drums to dump water which had accumulated in the empty barrels before loading them onto their truck for removal from the premises.  Exh. 19.  Prior to 1991, "Feldman Barrel would remove the empty barrels from Neumade's property, refurbish them and return them to the manufacturer of the paint."  Mix Aff., ¶ ¶ 7, 9.

By letter dated September 8, 1999, GZA reported the following results of "additional subsurface explorations . . . to further evaluate possible soil and drainage structure sediment contamination:"

Geoprobe Samples
Toluene, ethylbenzene, and/or xylenes were detected at eight of the eleven geoprobe soil samples tested.  The concentrations of toluene (detected in three samples) ranged from 10 ppb to 22 ppb, ethylbenzene (four samples) from 40 ppb to 3,340 ppb, and xylenes (eight samples) from 16 ppb to 11,700 ppb.  Acetone was detected at ten of the eleven soil samples tested.  The acetone concentration detected ranged from 48 ppb to 2,660 ppb. . . .

Drainage Structure Samples
Various volatile organic compounds . . . were detected in the three drainage structures sampled.  The highest concentration of ethylbenzene (3,500 ppb), toluene (2,050

ppb), xylenes (7,800 ppb) and acetone (3,450 ppb) were detected in the ramp sump sediment sample.

Exh. 30.  GZA noted that

The NYSDEC TAGM clean-up criteria were exceeded only in the sump (at the loading dock) and in soil boring B-22 (borings at one foot yielded results for m, p-xylene at 5,900 ppb and o-xylene at 1,490 xylenes of 1,200 ppb and at a depth of five feet yielded readings of m, p-xylene of 11,700 ppb).

Exh. 31.

CRA Services conducted a Phase I Environmental Site Assessment for a prospective tenant in November of 1999 and determined that there were no recognized environmental conditions or potential environmental compliance issues at the site.

Exh. R.

On February 28, 2000, Benderson transferred the property to a trust.

Exh. D.

By Decision and Order filed September 21, 2000 (Dkt. #34), the Hon. Hugh B. Scott, U.S.M.J., denied Benderson's motion for summary judgment, opining, as relevant to the instant motion, as follows:

Benderson's claim based upon the contractual requirement that the property be delivered in a '"clean" condition, as specified by law' is not barred by the statute of limitations.

. . . The "law" upon which this provision is based is not identified in the 1992 Lease document.  Further, as discussed below, it is not clear that the DEC would require remediation of the site based upon the levels of

> contamination found and the guidelines identified by the plaintiff.  A question exists as to whether the parties to the contract were in agreement that the requirement that the facility be delivered in "a 'clean' condition as specified by law" would apply to trigger liquidated damages where levels of some substances were found to exceed certain guidelines but might not require remediation pursuant to the DEC.  In this regard, the terms of the 1992 Lease are ambiguous. Although the Court must interpret the contract to resolve such an ambiguity, the intentions of the parties with respect to this issue cannot be conclusively discerned based upon the record before the Court.

Exh. 3, pp.9-10.  The Court also found the fact that certain substances exceeded the

parameters set forth by the NYSDEC in TAGM 4046 not determinative because

> the TAGM guidelines, by themselves, do not necessarily establish the final allowances required by law.  The information presented to the Court is insufficient to establish, as a matter of law, that the defendant's failed to deliver the premises in "a 'clean' condition, as specified by law."

Exh. #3, p.11.  Thus, the Court determined that

> It is not clear, based upon the instant record, that the agreement expressly required a finding by some governmental agency that remediation was necessary prior to imposing the contractual obligations in paragraph 54. However, the Court is not convinced that the language of the 1992 Lease expressly reflects that Neumade agreed, or intended to agree, to pay cleanup costs and/or additional rent (in the form of liquidated damages) where cleanup might not be necessary.

Exh. #3, p.12.  The Court found that it could not conclude,

> *as a matter of law*, that the asserted acts of Benderson and its agents or other tenants (such as the roof repair performed by Benderson's contractor) could not have contributed to the presence of some of the toxins found on the site.  This remains a question of fact with respect to the plaintiff's contract claim.

Exh. #3, p.11.

With respect to the CERCLA claims, Judge Scott determined that

> plaintiff has failed to demonstrate that its response was
> consistent with the NCP.  Indeed, in this regard, the plaintiff
> states that its "costs and this [sic] consistency with the NCP
> will be the subject of a future proceeding in this case."

Exh. #3, p.13.   Judge Scott also determined that questions of fact "as to when the

alleged release of contaminants took place" precluded a determination as to whether

the tort claims were barred by the statute of limitations and that questions of fact

"regarding the origination and levels of the alleged contaminants" precluded summary

judgment on the ultra-hazardous activity and public nuisance claims.  Dkt. #3, p.15.


Claiming that it needed to obtain a decision from the NYSDEC whether

further investigation or remediation at the property would be required before it could

obtain financing for the property, Benderson sent a letter to the NYSDEC on October 4,

2000, informing the NYSDEC that the 70 cubic yard area excavated by Neumade in

1992-1993 "was a paint-waste dump site during Neumade's tenancy and continues to

be a problem area at the facility."  Dkt. #54, ¶ 57 & Exh. 24.  Benderson advised the

NYSDEC that they had

> retained GZA to conduct a site investigation to determine
> whether there is evidence that any recognized
> environmental condition may exist at the property which
> would warrant further investigation.  GZA identified
> Neumade's former paint shop area, the rear door area, the
> sumps, and the parts washing areas as areas which
> required further investigation.
>
> In May, 1997, [Benderson] retained GZA to conduct a
> Phase II investigation of the "red flag" areas noted in the
> March site investigation.  The results were reported in GZA's
> May, 1997 Subsurface Exploration and Sump Evaluation

Report.  As you can see, certain volatile organic chemicals and petroleum-based chemicals were found.  DEC TAGM levels for acetone of 2,000 ppb were exceeded in the paint shop area which had a reading of 4,600 ppb and in sump sediments in the loading dock area where a reading of 21,000 ppb was recorded.  Levels for m, p-xylenes [sic] 7,400 ppb and p-xylenes 3,100 ppb were detected in the paint shop area.  Sump sediments in the loading dock area reported m, p-xylenes 15,000 ppb and o-xylenes of 6,300 ppb.  Based on these results, GZA conducted a further subsurface investigation to identify the nature and areal extent of contamination, if any, throughout the site.  The results of the investigation were reported in GZA's April, 1999 Additional Subsurface Exploration Report.  There are a number of VOC compounds found at measurable levels in 12 soil borings, but only m&p xylene was found in excess of DEC clean-up standards (181.4 ug/kg at B-3 against the DEC TAGM level of 100 ug/kg).

In the summer of 1999, during a deposition on litigation related to this matter, the former plant manager from Neumade, King Mix, identified specific areas of the property where Neumade had engaged in the use, storage, and disposal of products containing hazardous substances.  As a result of this testimony, [Benderson] retained GZA to conduct a focused environmental investigation of the areas identified by Mr. Mix.  The results of that investigation were reported in GZA's September, 1999 Supplemental Subsurface Exploration Report.  As you can see from this Report, residual contaminants, such as toluene, ethylbenzene and xylenes were detected in all of the soil samples tested and acetone was detected in ten of the eleven soil samples tested, but DEC TAGM clean-up criteria was exceeded only in the sump (at the loading dock) area and in soil boring B-22 (borings at one foot yielded results for m, p-xylene at 5,900 ppb and o-xylene at 1,490, xylenes of 1,200 ppb and at a depth of five feet yielded readings of m, p-xylene of 11,700 ppb).

Benderson has determined that it will excavate all areas which have evidence of substances in soils in excess of TAGM clean-up criteria.  Towards that end, our consultant will submit to you a Removal Action Plan.  The RAP will provide that Benderson will excavate and remove all impacted soils, properly dispose of any impacted soils off-

site at a permitted facility; take confirmatory floor and
sidewall samples; and backfill, compact and pave the area.
All removal activities will be completed in conformance with
DEC regulations and enforcement and guidance
memoranda.

Exh. 24.

On October 20, 2000, Tom Johnson of the NYSDEC met with GZA

Project Manager Gary Klawinski and Benderson's counsel and "agreed that additional

work should be performed at two locations."  Exh. U.  Specifically, it was determined

that location B-22, near Neumade's Spill Area #5, "should be excavated to reach the

clean-up volatile numbers" and that the loading dock catch basin "should be cleaned

out and checked for structural integrity."  Exh. U; *see also* Dkt. #54, Klawinski Aff., ¶ 20.

By letter dated November 1, 2000, James Charles, Senior Attorney for the

NYSDEC Division of Environmental Enforcement informed Benderson that

In response to your letter dated October 4, 2000 to Martin
Doster concerning your client's proposal to remove the
residual contamination at this Site, please be advised that
the Department will require that this proposal be made in the
form of a Remediation Work Plan and implementation
schedule.  The Work Plan should address those two areas
identified as needing additional remediation during the
October 20, 2000 site inspection conducted by Thomas
Johnson of this Department, GZA Project Manager Gary
Kalwinski, and Angela Demerle of your office.  The first area
includes the possible waste paint disposal area located near
geoprobe boring B-22.  The volatile compounds located in
this area's soil should be removed until the residual
contaminants are within NYSDEC TAGAM 4046 guidance
values.  The second area is the loading dock catch basin
located in the "new addition warehouse."  The basin should
be cleaned and checked for structural integrity.  Additional

> sampling may be indicated if the basin is cracked or has an earthen base.  The outfall on the east side of the parking lot which is connected to this basin should also be sampled.

Dkt. #62, Exh. 37.


On December 5, 2000, Tom Johnson of the NYSDEC observed excavation of approximately 20' x 20' to a depth of 6'-7' in an area slightly south of Spill Area #5.  Exh. U.  The NYSDEC "agreed that the extent of the material removed satisfied the work plan."  Exh. U.  With respect to the sump pit area in the new addition warehouse, Mr. Johnson indicated that

> The work at this area was performed at a later date.  Gary Klowinski of GZA contacted me on December 14, 20000 and informed me that the sump pit was cleaned out and the pit consisted of a concrete lined basin.  Water was introduced and let set and no leakage was noted.  He feels that the integrity of the pit would have kept chemical contamination from infiltrating the native soils.

Exh. U.


On December 19, 2000, GZA advised Benderson's counsel that

> confirmatory soil sample test results collected from the excavation (area near B-22) and the sediment sample collected from catch basin located downstream from the impacted sump were below the NYSDEC TAGM-406 Recommended Soil Cleanup Objectives.  Therefore, GZA does not anticipate that additional removal work associated with the area near B-22 and the downstream catch basin will be required by the NYSDEC.

> The loading dock sump pump put has been cleaned (removal of water/sediment and pressure washed).  Observations by GZA indicated that the concrete pit was intact.  GZA informed the NYSDEC (Mr. Tom Johnson) that

the sump put appeared intact.  The NYSDEC indicated that
additional work would not be required for the sump pit.

Exh. U.


On December 27, 2000, Benderson entered into an Order on Consent

with the NYSDEC.  Exh. 25.  The Order on Consent specifically provides that

To the extent authorized under 42 U.S.C. Section 9613 and
any other applicable law, Respondent shall not be liable for
any claim, now or in the future, in the nature of contribution
by potentially responsible parties concerning the alleged
contamination which is the subject matter of this Order.  In
any future action brought by Respondent against a
potentially responsible party under the Comprehensive
Environmental Response, Compensation and Liability Act of
1980, as amended, the provisions of 42 U.S.C. Section
9613(f)(3) shall apply.

Exh. 25.


GZA's Remediation Report, dated May, 2001, indicated that

approximately 95 cubic yards of impacted soil were removed from the excavation,

which included "the locations of the former borings B-22 and B-20, which were

conducted during previous investigations at the Site. Exh. 32.  The soil and sump pump

sediment  were characterized "as non-hazardous VOC impacted soil" and disposed in a

local landfill.  Exh. 32.  The liquid from the sump pump was profiled "as

trichloroethylene impacted water" and disposed as "VOC impacted hazardous liquid

waste" at a certified hazardous waste disposal facility.  Exh. 32.  GZA reported that

contaminants had not migrated to any of the downstream catch basins.  Exh. 32.

-18-

By letter dated August 21, 2001, the NYSDEC advised that the "analytical results and field observations" contained in the Remediation Report "gives sufficient evidence that the remedial work has removed enough contamination to be within the clean-up standards for the Department."  Exh. 33.  Accordingly, the NYSDEC advised that "[f]urther remedial work on the areas of concern for this project are unnecessary at this time."  Exh. 33.

## DISCUSSION

**CERCLA Causes of Action**

Benderson argues that the issue of fact raised by Judge Scott, *to wit*, compliance with the NCP, has been established by virtue of the NYSDEC's Order on Consent.  Dkt. #55, p.14.  Neumade responds that there remains a question of fact as to whether the work implemented at the site in December, 2000 was in compliance with the NCP.  Dkt. #58, p.15.

Neumade also argues that Benderson is unable to maintain an action pursuant to § 107 of CERCLA because it is a potentially responsible party by virtue of its status as an owner and/or operator of the facility.  Dkt. #58, p.12.  Benderson replies that a § 107 action is permissible because there is no evidence that it is a potentially responsible party.  Dkt. #63, p.12-13.  Alternatively, Benderson argues that it is entitled to 100% of its costs as contribution.  Dkt. #55, p.20.  Neumade claims that a contribution action is barred by the statute of limitations because § 113 of CERCLA required commencement of any contribution action within three years of the NYSDEC's 1993 certification of its remediation as complete.  Dkt. #58, p.14.

           42 U.S.C. § 9607 – Indemnity

>In its original form, CERCLA contained no express provision authorizing a private party that had incurred cleanup costs to seek contribution from other PRP's.  In numerous cases, however, District Courts interpreted the statute – particularly the § 107 provisions outlining the liabilities and defenses of persons against whom the Government may assert claims – to impliedly authorize such a cause of action.
>
>The 1986 amendments included a provision – CERCLA § 113(f) – that expressly created a cause of action for contribution . . . . Other SARA provisions, moreover, appeared to endorse the judicial decisions recognizing a cause of action under § 107 by presupposing that such an action existed.  An amendment to § 107 itself, for example, refers to "amounts recoverable in an action under this section."  42 USC § 9607(a)(4)(D) . . . . The new contribution section also contains a reference to a "civil action . . . under this section."  42 USC § 9613(f)(1) . . . . Thus the statute now expressly authorizes a cause of action for contribution in § 113 and impliedly authorizes a similar and somewhat overlapping remedy in § 107.

*Key Tronic Corp. v. United States*, 511 U.S. 809, 816 (1994) (footnote omitted).


        Subsequent to the Supreme Court's decision in *Key Tronic*, the Court of Appeals for the Second Circuit interpreted the 1986 amendments and determined that

>The language of CERCLA suggests Congress planned that an innocent party be able to sue for full recovery of its costs, *i.e.*, indemnity under § 107(a), while a party that is itself liable may recover only those costs exceeding its pro rata share of the entire cleanup expenditure, *i.e.*, contribution under § 113(f)(1).

*Bedford Affiliates v. Sills*, 156 F.3d 416, 424 (2d Cir. 1998).  Although the dissent in *Cooper Industries v. Aviall Services* recently challenged this interpretation of the statute, the United States Supreme Court expressly declined to consider whether

decisions "holding that a private party that is itself a [potentially responsible party] may not pursue a § 107(a) action against other [potentially responsible parties] for joint and several liability" are correct.  125 S. Ct. 577, 585 (2004).  The Court of Appeals for the Second Circuit also declined to determine "whether the rule announced in *Bedford Affiliates* remains viable after *Cooper Industries*."  *Syms v. Olin Corp.*, __ F.3d __, 2005 WL 1164011, at *8 (2d Cir. May 18, 2005).  It is this Court's opinion that *Bedford Affiliates* remains controlling precedent in this circuit.  *See Elementis Chems. Inc. v. T H Agric. & Nutrition, LLC*, 2005 WL 236488, at *10-13 (S.D.N.Y. Jan. 31, 2005) (rejecting argument that *Cooper Industries* effectively overruled *Bedford Affiliates*).

As the owner of the property during the period in which it alleges the environmental contamination occurred, Benderson is a potentially responsible party and cannot, pursuant to *Bedford Affiliates*, avail itself of 42 U.S.C. § 9607.  *Bedford Affiliates,* 156 F.3d at 425.  Contrary to Neumade's argument, it is irrelevant whether Benderson owned the property at the time it undertook remediation of the property; what is relevant is whether Benderson falls within any of the designated classes of potentially responsible parties set forth in 42 U.S.C. § 9607.  *See* Dkt. #59, ¶134. Benderson was the owner of the property during the time frame when hazardous substances were disposed on the property – that is all that is required for CERCLA liability to attach.  *See State of New York v. Shore Realty Corp.*, 759 F.2d 1032, 1044 (2d Cir. 1985) ("Prior owners and operators are liable only if they owned or operated the facility 'at the time of disposal of any hazardous substance'").

42 U.S.C. § 113(f)(1) – Contribution

In *Cooper Industries*, the Supreme Court of the United States considered

"whether a private party who has not been sued under § 106 or § 107(a) may

nevertheless obtain contribution under § 113(f)(1) from other liable parties. *Cooper*

*Industries*, 125 S. Ct. at 580.  42 U.S.C. § 113(f)(1), CERCLA's contribution statute,

provides, *inter alia*, that

> Any person may seek contribution from any other person
> who is liable or potentially liable under section 9607(a) of
> this title, during or following any civil action under section
> 9606 of this title or under section 9607(a) of this title.

Upon review of the plain language of the statute, the Supreme Court held that a

potentially responsible party cannot obtain contribution pursuant to 42 U.S.C.

§ 9613(f)(1) unless that party has been subjected to a civil action pursuant to 42 U.S.C.

§ 9606 or § 9607(a).  *Cooper Industries*, 125 S. Ct. at 583-84.  Since it is undisputed

that no such civil action was commenced against Benderson, *Cooper Industries*

forecloses Benderson's claim pursuant to 42 U.S.C. § 9613(f)(1).

42 U.S.C. § 9613(f)(3)(B) – Contribution

The Supreme Court's decision in *Cooper Industries* noted that the statute

provided an alternate avenue for contribution – § 113(f)(3)(B), which provides that

> A person who has resolved its liability to the United States or
> a State for some or all of a response action or for some or all
> of the costs of such action in an administrative or judicially
> approved settlement may seek contribution from any person
> who is not party to a settlement referred to in paragraph (2).

42 U.S.C. § 9613(f)(2) provides that

> A person who has resolved its liability to the United States or
> a State in an administrative or judicially approved settlement
> shall not be liable for claims for contribution regarding
> matters addressed in the settlement.

Benderson incurred liability for the environmental contamination of the property as evidenced by the Order on Consent entered into with the NYSDEC.  Exh. 25.  That Order specifically provided that "the provisions of 42 U.S.C. Section 9613(f)(3) shall apply" to Benderson.  Exh. 25.  Thus, Benderson may seek contribution from Neumade to the extent that its claim against Neumade can be separated from the matters addressed in Neumade's Order on Consent with the NYSDEC.

<u>Standards for Entitlement to Contribution</u>

To establish entitlement to contribution as a matter of law, plaintiff must demonstrate that:

> a. the defendant is within one of the four categories of responsible parties enumerated in 9607(a) of CERCLA, *to wit*: (1) present owners and operators of facilities that accepted hazardous substances; (2) past owners and operators of such facilities; (3) generators of hazardous substances and persons who arrange for disposal of hazardous substances, and (4) certain transporters of hazardous substances;
> b. the landfill site is a facility as defined in § 9601(9);
> c. there is a release or threatened release of hazardous substances at the facility;
> d. the plaintiff incurred costs responding to the release or threatened release; and
> e. the costs and response actions conform to the national contingency plan.

*See* 42 U.S.C. § 9607(a)*; see also B.F. Goodrich v. Betkoski*, 99 F.3d 505, 514 (2d Cir.

1996), *cert. denied sub nom., Zollo Drum, Inc. v. B.F. Goodrich Co.*, 524 U.S. 926

(1998), *overruled on other grounds by New York v. National Servs. Indus.*, 362 F.3d

682 (2d Cir. 2003); *Buffalo Color Corp. v. AlliedSignal, Inc.*, 139 F. Supp.2d 409, 415

(W.D.N.Y. 2001).

> Once a plaintiff makes a *prima facie* showing, a defendant
> may avoid liability only if it establishes by a preponderance
> of the evidence that the release or threatened release was
> caused by an act of God, an act of war, certain acts or
> omissions of third parties other than those with whom the
> defendant has a contractual relationship, or a combination of
> these reasons.  42 U.S.C. § 9607(b).  If the plaintiff can
> establish each of the *prima facie* elements on undisputed
> facts, and the defendant is unable to demonstrate by a
> preponderance of the evidence that an affirmative defense
> applies, summary judgment on liability is appropriate. *Alcan*,[4]
> 990 F.2d at 720.  Significantly, it is "*not* required that the
> [plaintiff] show that a specific defendant's waste caused
> incurrence of clean-up costs." *Id.* at 721.  Because CERCLA
> imposes strict liability, there is no causation requirement.

*Id.*

### Compliance with the National Contingency Plan

Neumade challenges whether Benderson's actions complied with the

National Contingency Plan.  Dkt. #59, p.14.  Specifically, Neumade complains that

Benderson sought additional environmental studies in an effort to bolster their position

against Neumade in this litigation despite their own consultant's April 6, 1997 report that

no additional work was recommended; that Neumade was never informed that any

further action was required following its completion of work pursuant to the 1992

---

[4] *United States v. Alcan Aluminum Corp.*, 990 F.2d 711 (2d Cir. 1993).

-24-

Consent Order; and that Benderson's Consent Order, obtained after the remediation,

cannot be used against Neumade in this action.  Dkt. #59, ¶ ¶ 102-106; 128-129; 132.

The National Contingency Plan provides "organizational structure and

procedures for preparing for and responding to . . . releases of hazardous substances."

*Nashua Corp. v. Norton Co.*, 116 F. Supp.2d 330, 352 (N.D.N.Y. 2000), *citing* 40 C.F.R.

§ 300.1.

> When the EPA amended the National [Contingency] Plan in 1990, it sought to encourage private parties to perform voluntary environmental cleanups by removing unnecessary obstacles to their ability to recover cleanup costs.  See National Plan, 55 Fed.Reg. at 8792-93; *see also Betkoski*, 99 F.3d at 514 ("As a remedial statute, CERCLA should be construed liberally to give effect to its purposes . . . . These include facilitating efficient responses to environmental harm.").  The EPA expressly recognized the pitfalls of requiring private parties to adhere to a detailed set of mechanical rules: "[P]roviding a list of rigid requirements may serve to defeat cost recovery for meritorious cleanup actions based on a mere technical failure by the private party that has taken the responsive action."  National Plan, 55 Fed.Reg. at 8793.  Thus, the EPA abandoned its former ritualistic rule in favor of a case-by-case balancing approach that would evaluate the cleanup effort as a whole to ensure the quality of the cleanup while removing undue procedural obstacles to National Plan consistency.

*Bedford Affiliates*, 156 F.3d at 428.

The National Contingency Plan provides that "[r]esponsible parties shall

be liable for necessary costs of response actions to releases of hazardous substances

incurred by any other person consistent with the NCP.  40 C.F.R. § 300.700(c)(2).

> A private party response action will be considered "consistent with the NCP" if the action, when evaluated as a

whole, is in substantial compliance with the applicable
requirements in paragraphs (5) and (6) of this section, and
results in a CERCLA-quality cleanup . . . .

40 C.F.R. § 300.700(c)(3).  40 C.F.R. § 300.700(c)(5) & (6) set forth numerous

provisions as "potentially applicable" to private party response actions:

> a.   providing for worker health and safety (40 C.F.R. § 300.150);
> b.   documentation of costs incurred during remediation (40 C.F.R. § 300.160);
> c.   identification of any applicable or relevant and appropriate requirements ("ARARs") (40 C.F.R. § 300.400(g));
> d.   reporting of releases of hazardous material (40 C.F.R. § 300.405(b), (c) & (d));
> e.   perform remedial site evaluation (40 C.F.R. § 300.420);
> f.   conduct remedial preliminary assessment and a remedial site inspection (40 C.F.R. § 300.430);
> g.   develop remedial design consistent with the selected remedy and implemented the remedial action (40 C.F.R. § 300.435); and
> h.   afford opportunity for public comment and community relations (40 C.F.R. §§ 300.155; 300.430(c); 300.430(f)(2), (3) & (6); 300.435(c)).

*See Sealy Conn., Inc. v. Litton Inds, Inc.*, 93 F.Supp.2d 177, 186 (D. Conn. 2000).


Although the Order on Consent was entered into subsequent to the

remediation of the site, it's recitation of the obligations Benderson undertook

substantially incorporates the requirements of 40 C.F.R.  § 300.700(c)(5) & (6).

Moreover, the GZA engineer, Gary J. Klawinski, affirms that he complied with

instructions from Benderson to ensure that his work complied with the National

Contingency Plan.  Klawinski Aff., ¶ 37.  Specifically, Mr.  Klawinski affirms that:

> 37.   Before preparing a Work Plan regarding site
>       remediation, I was informed by Benderson's attorneys
>       that the work must comply in all respects with the

National Contingency Plan ("NCP").  I was also informed that the DEC was implementing site cleanup through an Order on Consent.  Such Orders on Consent incorporate the requirements which must be met for an NCP-compliant cleanup.

38.   I have been involved in numerous cleanups requiring consistency with the NCP.  Therefore, I have extensive experience in preparing work plans and implementing remediations compliant with these regulations.

39.   Consequently, the Interim Remedial Measure Program ("IRM") Work Plan that [sic] was prepared consistent with the NCP.  The IRM was followed, and, as a result, the work as implemented at the site in December 2000 was NCP-compliant.

Klawinski Aff. ¶¶ 37-39.

The only aspect of the National Contingency Plan requirements which Neumade appears to specifically challenge is the requirement for public comment.  In *Bedford Affiliates*, the Court of Appeals for the Second Circuit was presented with the question of whether a remediation plan was inconsistent with the National Contingency Plan "because, although approved by the NYSDEC, public comment was not solicited." 156 F.3d at 427.   After noting that the 1990 amendments to the National Contingency Plan provided increased flexibility, the Court determined that

The 1990 revisions to the National Plan suggest that significant state involvement serves the identical purpose that the public notice provision seeks to effectuate.  The EPA added the public notice provision because [t]he public – both [potentially responsible persons] and concerned citizens – have a strong interest in participating in cleanup decisions that may affect them, and their involvement helps to ensure that these cleanups – *which are performed without governmental supervision* – are carried out in an environmentally sound manner.  Thus, EPA

-27-

> has decided that providing public participation
> opportunities should be a condition for cost
> recovery under CERCLA.
> National Plan, 55 Fed. Reg. at 8795 (emphasis added).
> This language suggests that when the EPA inserted the
> public comment provision, it was troubled by private
> cleanups lacking significant governmental involvement.
> These concerns are mitigated – if not eliminated – where, as
> here, a state environmental agency is substantially involved
> in the formulation and execution of a preliminary remediation
> plan.

*Id*. at 428.   The Court concluded that "[w]here a state agency responsible for

overseeing remediation of hazardous wastes gives comprehensive input, and the

private parties involved act pursuant to those instructions, the state participation may

fulfill the public participation requirement." *Id.*


In addition, the Court notes that the Court of Appeals for the Seventh

Circuit has determined that involvement of a governmental agency can demonstrate

consistency with the National Contingency Plan.  *Nutrasweet Co. v. X-L Eng'g Co.*, 227

F.3d 776, 791 (7th Cir. 2000).  In that case,

> The Illinois EPA approved NutraSweet's clean-up plan, and
> the agency monitored the progress of the remediation.
> NutraSweet remediated its property until the Illinois EPA
> advised it that it could stop because NutraSweet's efforts
> had succeeeded to the maximum extent possible.  In light of
> this evidence, we are satisfied that NutraSweet met this
> requirement [NCP compliance] for a CERCLA recovery.

*Id.*; *see also Pfohl Brothers Landfill Site Steering Comm. v. Browning-Ferris Indus. of*

*New York, Inc.*, 2004 WL 941816, at *22 (W.D.N.Y. Jan. 30, 2004) ("Courts have held

that where a CERCLA response action involves a state environmental agency charged

with approving cleanup plans and monitoring the remediation process, the NCP consistency requirement is satisfied.").

In the instant case, Tom Johnson, the same NYSDEC representative involved in the Neumade Order on Consent, met with GZA Project Manager Gary Klawinski and Benderson's counsel and agreed, based upon GZA's site assessments, that location B-22 "should be excavated to reach the cleanup volatile numbers" and that the loading dock catch basin "should be cleaned out and checked for structural integrity."  Exh. U.  Mr. Johnson observed excavation at B-22 and conferred with GZA regarding the results of the sump pit remediation.  Exh. U.  The Court finds this involvement sufficiently similar to the involvement of the NYSDEC representative in *Bedford Affiliates* to satisfy the public participation guideline of the National Contingency Plan.  *See also Bello v. Barden Corp*., 180 F. Supp.2d 300, 309-10 (D. Conn. 2002).

Neumade argues that it should have been notified if additional action was required pursuant to the Order on Consent entered into with the NYSDEC in 1992.  Dkt. #59, ¶ 129.  However, Neumade's claimed inability to participate in the assessment and subsequent remediation of the property rings hollow in light of Benderson's notification to Neumade of its environmental concerns; it's request that Neumade obtain an environmental inspection to allay those concerns; its notification to Neumade that GZA had been engaged to conduct subsurface explorations and evaluation of the sump site; and the ongoing litigation with respect to environmental contamination at the site.  In addition, the Court finds that Benderson's motivation in investigating the environmental

condition of the property is irrelevant to an assessment of liability for the environmental contamination ultimately discovered.

Causation

Neumade also argues that Benderson has not established the origin of the sediments or liquid found in the sump pit.  Dkt. #59, ¶ 136.  This argument misstates Benderson's burden on summary judgment with respect to a CERCLA cause of action.  Benderson is not required to demonstrate that Neumade's contaminants caused the environmental contamination discovered in the sump pit, but is only required to demonstrate that a hazardous substance was discarded, *to wit*, discharged, deposited, dumped, spilled, leaked or placed on the site while Neumade controlled the site.  *See ABB Indus. Sys. v. Prime Tech., Inc.*, 120 F.3d 351, 356 (2d Cir. 1997); *see also United States v. Alcan Aluminum Corp.*, 990 F.2d 711, 721 (2d Cir. 1993) ("What is *not* required is that the government show that a specific defendant's waste caused incurrence of clean-up costs."); 42 U.S.C. § 6303 (3); 42 U.S.C.  § 9607(a)(2).  In any event, the record is clear that Neumade utilized xylene in its manufacturing operations and that xylene was detected at levels which the NYSDEC deemed hazardous in the sump pit and property adjacent to Nuemade's facility while Neumade retained control over the premises.  Exh. 12, 19, 21, 22, 23, 31; Exh. U; Dkt. #62, Exh. 37.  To the extent that Neumade believes it can demonstrate "alternative sources for any contamination at the Benderson property," it is free to commence a contribution action against those sources.  Dkt. #59, ¶ 149.  Moreover, Neumade may argue Benderson's responsibility for the contamination during the next phase of this litigation, in which the

Court will be called upon to apportion costs between the parties.  Benderson's motion

for summary judgment with respect to its claim for contribution is granted.


**Contract Causes of Action**

   Benderson argues that there is no genuine issue of fact that Neumade

breached paragraphs 54A, C and E of the lease and that liquidated damages are due

Benderson for the breach of paragraph 54C of the lease.  Dkt. #55, p.5.  Benderson

asserts that the NYSDEC's demand that Benderson cleanup the property in 2000

establishes as a matter of law that the property was not left in a "clean" condition.  Dkt.

#55, pp.6, 7.  Furthermore, Benderson contends that there is no question but that the

contamination was caused by Neumade based upon the deposition testimony of

Neumade's plant manager, King Mix, who correlates the location of hazardous

substances found during remediation with the location where Neumade disposed of

paint waste and solvent products and the fact that the hazardous substances are found

in materials used by Neumade.  Dkt. #55, pp. 6, 7-8.  Specifically, Benderson argues

that

> As to Areas B-20/B-22, the year 2000 excavations yielded
> contaminants in the soils which are identical to those found
> in the same area in 1990-1992, and the three GZA studies.
> These are identical to the hazardous substances found in
> the products used and disposed of by Neumade.

Dkt. #55, p.8.


   Neumade responds that the breach of contract claim is time barred and

that paragraph 54(C) is inapplicable to the lease by Neumade because "no

governmental authority having jurisdiction requires an environmental clearance report in New York." Dkt. #58, p.6.  Neumade asserts that this language pertains to other states, such as New Jersey, which legislate environmental assessment before transfer of industrial property, including the termination of a lease (*see* N.J. Stat. Ann.  § 13:1K-9 *et seq.*).  Dkt. #58, pp.8-12.


<u>Statute of Limitations</u>

New York provides a six-year statute of limitations for breach of contract, which begins to run from the day the contract was breached.  *ABB Indus. Sys.,* 120 F.3d at 360; N.Y. C.P.L.R. 213(2) (McKinney 2004).  With respect to the liquidated damages clause, the breach could not occur "[u]ntil such time as the Demised Premises are delivered to the Lessor by the Lessee . . . ."  Exh. 8, ¶ 54C.  Inasmuch as the premises was vacated by Neumade on June 30, 1997, commencement of this action on April 8, 1998 was timely.


With respect to that aspect of the contract claim which seeks indemnity from Neumade, it is clear that "[t]he six-year limitations period is measured from the time plaintiff suffered a loss by paying the debt for which it alleges defendant should be held responsible."  *Bologna v. Kerr-McGee Corp.*, 95 F. Supp.2d 197, 204 (S.D.N.Y. 2000); *see McDermott v. City of New York*, 50 N.Y.2d 211, 217-218 (1980) (whatever the underlying breach of duty for which indemnity is sought, accrual occurs upon payment by the party seeking indemnity).  Accordingly, Benderson may seek indemnity for any loss, claim, injury or damage to the environment as a result of the generation,

storage or release of any toxic, hazardous or similar substances by Neumade which Benderson has paid within six years of the commencement of this action on April 8, 1998.

<u>Indemnity</u>

Contrary to Benderson's argument, there are material questions of fact regarding the cause of the environmental contamination which required remediation. Benderson's own contractor, GZA, notes that xylene is a compound commonly associated with petroleum and a petroleum-based chemical.  Exh. 24, 29 & 31. Although it reported a petroleum spill caused by failing underground storage tanks on November 26, 1991, Benderson did not remove the underground petroleum storage tanks from the premises until December 4, 1993, subsequent to Neumade's removal, in April of 1992, of "black, oily, aromatic material" with a "petroleum sheen" which was "characterized by an odor different than the paint solvents."  Exh. 18; Exh. S. Moreover, Neumade submitted an affidavit from Randolph W. Rakoczynski, P.E., noting that "all storm water runoff and underground runoff from the Walden Industrial Park would flow generally towards the Neumade facility . . . ."  Rakoczynski Aff., ¶ 27. Neumade's plant manager, King Mix, also observed that "stormwater from all of the surrounding facilities drains into the loading dock area of the former Neumade building." Mix Aff, ¶ 36.  Thus, summary judgment is denied with respect to Benderson's claim for contractual indemnity.

Liquidated Damages

A court may construe a contract and grant summary judgment when the contractual language is plain and unambiguous. *Zurich Am. Ins. Co. v. ABM Indus., Inc.*, 397 F.3d 158, 164 (2d Cir. 2005). "Contract terms are not ambiguous if they have a definite and precise meaning and are not reasonably susceptible to differing interpretations." *RJE Corp. v. Northville Indus. Corp.*, 329 F.3d 310, 314 (2d Cir. 2003). Conversely, "[a]mbiguity exists when a contract is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Id.* (internal quotation omitted).

In the prior summary judgment decision, Judge Scott recognized that the law upon which the liquidated damages clause was based was not identified in the lease document and held that Benderson had failed to demonstrate, as a matter of law, that the conditions on the property violated the clause. Paragraph 54C clearly requires Neumade to provide Benderson with "any environmental clearance which may be required by any governmental authority having jurisdiction." Exh. 8. It further states that Neumade's obligation to pay Benderson rent will continue ninety days beyond the date that Benderson has obtained "a clean condition report as specified by law," thereby ensuring that the premises are being left "in a 'clean' condition, as specified by law." Exh. 8. Affording the language utilized in the contract its plain and ordinary meaning, Benderson's motion for summary judgment with respect to paragraph 54C

-34-

must be denied because there is no governmental authority which requires an environmental clearance and there is no law which requires a clean condition report or defines clean condition.  Benderson cannot create an ambiguity within the four corners of the contract by substituting its interpretation of the contract language for the unambiguous language contained within the contract.

**Ultra-Hazardous Activity & Public Nuisance**

Benderson argues that Neumade is strictly liable to Benderson for damages resulting from its disposal of hazardous substances, as such disposal constitutes an abnormally dangerous activity as a matter of New York law.  Dkt. #55, pp.21-22.  Benderson also argues that Neumade is liable as a matter of law for creating a public nuisance by virtue of its improper disposal of hazardous substances on the property.  Dkt. #55, p.22-23.

Neumade responds that Benderson's common law claims are preempted by CERCLA and barred by the statute of limitations.  Dkt. #58, pp.16-17.  Benderson replies that CERCLA does not preempt tort causes of action, but only preempts equitable remedial causes of action such as indemnification, contribution and restitution which are provided under CERCLA.  Dkt. #63, pp.21-22.  Benderson also argues that it did not discover the site contamination until it commenced its own environmental investigation of the site in 1997 and cannot be barred by any knowledge it may have had of the 1992 NYSDEC investigation and cleanup.  Dkt. #63, pp.23-24.

-35-

**Preeemption**

   The Court of Appeals for the Second Circuit has determined that CERCLA "does not expressly preempt state law, but simply prohibits states from 'recovering compensation for the same removal costs or damages or claims' under both CERCLA and state or other federal laws . . . .'" *Bedford Affiliates*, 156 F.3d at 426, *quoting Shore Realty*, 759 F.2d at 1041.  Because common law restitution and indemnification actions "would bypass the carefully crafted settlement system" within the CERCLA statute, creating an actual conflict between CERCLA and common law causes of action, "CERCLA preempts the state law remedies of restitution and indemnification" *Id.* at 427.  Since the torts of public nuisance and abnormally dangerous activity afford remedies distinct from those available pursuant to CERCLA, they are not preempted.


**Statute of Limitations**

   Because there remains a question of fact as to when the contamination at issue in this complaint occurred, the Court cannot determine whether Benderson first discovered, or through exercise of reasonable diligence should have discovered, the alleged injury to its property more than three years before it asserted these claims for public nuisance and ultra-hazardous activity.  *See Bano v. Union Carbide Corp.*, 361 F.3d 696, 709 (2d Cir. 2004); *see also* N.Y.C.P.L.R. §§ 214 & 214-c.


**Abnormally Dangerous or Ultra-Hazardous Activity**

   The imposition of strict liability upon entities which undertake abnormally dangerous activities is justified by policy considerations determining that "those who

engage in activity of sufficiently high risk of harm to others, especially where there are reasonable even if more costly alternatives, should bear the cost of harm caused the innocent." *Doundoulakis v. Town of Hempstead*, 42 N.Y.2d 440, 448 (1977), *citing* Restatement (Second) of Torts § 519 (1977).  Multiple factors must be considered in assessing whether an activity is abnormally dangerous, including the following:

1. existence of a high degree of risk of harm to the person, land or chattels of others;
2. likelihood that the harm that results from it will be great;
3. inability to eliminate the risk by the exercise of reasonable care;
4. extent to which the activity is not a matter of common usage;
5. inappropriateness of the activity to the place where it is carried on; and
6. extent to which its value to the community is outweighed by its dangerous attributes.

*Id.*, *citing* Restatement (Second) of Torts § 520 (1977).


In the instant case, Benderson has failed to establish as a matter of law that Neumade's  industrial activities were abnormally dangerous or ultra-hazardous. The use of paint solvents during the manufacture of equipment in an industrial park is neither uncommon or inappropriate as a matter of law.  The environmental contaminants requiring remediation appear to be common substances in both paint solvents and petroleum compounds and the damage these substances can inflict upon the environment appears to be completely avoidable with the exercise of reasonable care.  Accordingly, Benderson's motion for summary judgment with respect to this claim is denied.

**Public Nuisance**

In order to establish a defendant's liability for the tort of public nuisance, a plaintiff must prove each of three elements by clear and convincing evidence:

1. the existence of a public nuisance;
2. conduct or omissions by a defendant that create, contribute to, or maintain that public nuisance; and
3. particular harm suffered by plaintiff different in kind from that suffered by the community at large as a result of the public nuisance.

*NAACP v. Acusport, Inc.*, 271 F. Supp.2d 435, 482 (E.D.N.Y. 2003).  "[T]he release or threat of release of hazardous waste into the environment unreasonably infringes upon a public right and thus is a public nuisance as a matter of New York law."  *Shore Realty*, 759 F.2d at 1051.  As discussed previously, however, there remains a question of fact as to whether Neumade caused the environmental contamination for which Benderson seeks damages.  Accordingly, Benderson's motion for summary judgment with respect to this claim is denied.

**CONCLUSION**

For the foregoing reasons, plaintiff's motion for summary judgment (Dkt. #54), is granted with respect to its claim for contribution pursuant to CERCLA and the remainder of plaintiff's motion for summary judgment is denied.

**SO ORDERED.**

S/ H. Kenneth Schroeder, Jr.
H. KENNETH SCHROEDER, JR.
United States Magistrate Judge

DATED:      Buffalo, New York
            June 13, 2005

-38-